ACCEPTED
05-23-00539-CV
FIFTH COURT OF APPEALS
DALLAS, TEXAS
2/20/2024 12:09 PM
RUBEN MORIN
CLERK

# No. 05-23-00539-CV

IN THE COURT OF APPEALS
FOR THE FIFTH DISTRICT
DALLAS TEXAS

FILED IN
5th COURT OF APPEALS
DALLAS, TEXAS
2/20/2024 12:09:24 PM
Ruben Morin
Clerk

VISIONARY INDUSTRIAL INSULTATION, INC.,

Appellant

v.

TTHREI, LLC AND TIMOTHY HOLLAND,

Appellees

On Appeal from County Court at Law No. 2, Grayson County, Texas,
Trial Court Cause No. 2021-2-130CV

## APPELLANT'S BRIEF

Sul Lee
State Bar No. 24078844
Diren W. Singhe
State Bar No. 24044135
J. Spencer Young
State Bar No. 24101268
SUL LEE LAW FIRM, PLLC
3030 Lyndon B Johnson Fwy, Ste. 220
Dallas, TX 75234

Kyle Carney
Texas Bar No. 24096789
CARNEY LAW PLLC
9800 Hillwood Pkwy., Ste. 140
Fort Worth, TX 76177

**ATTORNEYS FOR APPELLANT**

**ORAL ARGUMENT REQUESTED**

## IDENTITY OF PARTIES AND COUNSEL

**<u>Appellant:</u>**

Visionary Industrial Insultation, Inc.

**<u>Counsel for Appellants:</u>**

Sul Lee (Attorney in Charge)
Sul@SulLeeLaw.com
Diren W. Singhe
DSinghe@SulLeeLaw.com
J. Spencer Young
SYoung@SulLeeLaw.com

SUL LEE LAW FIRM, PLLC 3030
Lyndon B. Johnson Fwy, Suite
220 Dallas, Texas 75234
Telephone: 214-206-4064

Kyle Carney
Texas Bar No. 24096789 CARNEY
LAW PLLC
9800 Hillwood Pkwy., Ste. 140
Fort Worth, TX 76177
Phone: (817) 717-1195 Facsimile:
(817) 616-8751  Email:
kyle@carney.law

**<u>Counsel for Appellees:</u>**

**<u>Appellees:</u>**

TTHREI, LLC
Timothy Holland

J. Stephen Hunnicutt
Steve@HunnicuttLaw.com
Timothy A. Robinson
Tim@HunnicuttLaw.com

THE HUNNICUTT LAW GROUP
17330 Preston Rd.
STE. 275B
DALLAS, TX 75252
Telephone: (214) 361-6740

ii

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL ....................................................... ii

TABLE OF CONTENTS............................................................................... iii

TABLE OF AUTHORITIES........................................................................ iv

STATEMENT OF THE CASE..................................................................... vii

STATEMENT REGARDING ORAL ARGUMENT ...................................... ix

ISSUE PRESENTED .................................................................................x

STATEMENT OF FACTS ...........................................................................1

SUMMARY OF THE ARGUMENT ................................................................ 4

ARGUMENTS AND AUTHORITIES............................................................ 6

A.    Standard of Review.................................................................... 6

B.    The Trial Court Erred in Granting Holland and TTHREI's Traditional Summary Judgment Motion. ...................................................... 6

C.    The No-Evidence Summary Judgment Was Defective as a Matter of Law. ..........................................................................................14

D.    Appellees' Claims are Time Barred. ..................................................17

PRAYER..................................................................................................19

CERTIFICATE OF COMPLIANCE..............................................................21

CERTIFICATE OF SERVICE ....................................................................21

APPENDIX ............................................................................................. 22

# TABLE OF AUTHORITIES

**CASES**

*Am. Home Fence Co. v. Himes*,
374 S.W.2d 777 (Tex. App.—Tyler 1964)..................................................8

*Barker v. Eckman*,
213 S.W. 3d 306 (Tex. 2006)....................................................................17

*City of Dall. v. Homan*,
2022 Tex. App. LEXIS 2148 (2022) .........................................................6

*City of Keller v. Wilson*,
168 S.W.3d 802 (Tex. 2005)......................................................................7

*E.P. Towne Ctr. v. Chopsticks, Inc.*,
242 S.W. 3d 117 .....................................................................................17

*In re Estate of Poe*,
648 S.W.3d 277 (Tex. 2022) ...................................................................15

*International Bankers Life Ins. v. Holloway*,
368 S.W.2d 567 (Tex. 1963) ...................................................................14

*Jones v. Houston Materials Co.*,
477 S.W.2d 694 (Tex. App.—Houston [14th Dist.] 1972, no writ) .........8

*Jones v. Strauss*,
745 S.W.2d 898 (Tex. 1988) .....................................................................6

*Jose Fuentes Co. v. Alfaro*,
418 S.W.3d 280 (Tex. App.—Dallas 2013, pet. denied).........................14

*Kaldis v. Crest Fin.*,
463 S.W.3d 588 (Tex. App.—Houston [1st Dist.] 2015, no pet.)............7

*Kaufman Cty. v. Combs*,
393 S.W.3d 336 (Tex. App.—Dallas 2012, pet. denied).........................6

*Lear Siegler, Inc. v. Perez*,
  819 S.W.2d 470 (Tex. 1991) .......................................................................7

*Livingston Ford Mercury, Inc. v. Haley*,
  997 S.W.2d 425 (Tex. App.—Beaumont 1999, no pet.) ...................... 8, 9

*Merriman v. XTO Energy, Inc.*,
  407 S.W.3d 244 (Tex. 2013) ...................................................................... 6

*Meyer v. Cathey*,
  167 S.W.3d 327 (Tex. 2005)....................................................................15

*Nall v. Plunkett*,
  404 S.W.3d 552 (Tex. 2013) .....................................................................7

*Schlumberger Tech. v. Swanson*,
  959 S.W.2d 171 (Tex. 1997)....................................................................15

*Sharif v. Par Tech, Inc.*,
  135 S.W.3d 869 (Tex. App.—Houston 1st Dist. 2004)........................... 8

*Stine v. Stewart*,
  80 S.W.3d 586 (Tex. 2002) .....................................................................17

**STATUTES**

Business and Commerce Code § 26.01 .........................................................16

Civil Practice and Remedies Code § 16.051 .................................................17

**RULES**

Texas Rules of Civil Procedure Rule 93........................................................ 8

Texas Rules of Civil Procedure Rule 166a ...............................................7, 13

Texas Rules of Civil Procedure Rule 185 .................................................... 8

Texas Rules of Appellate Procedure Rule 6.3 .............................................21

Texas Rules of Appellate Procedure Rule 9.4(i)(1) .......................................21

# STATEMENT OF THE CASE

Nature of the Case:     This is an appeal from a summary judgment order on cross motions for summary judgment in a civil dispute over invoices asserted by a consultant-turned-company-officer who claimed he was owed amounts for services allegedly rendered prior to his employment, despite the applicable limitations period and his self-directed compensation during his employment as a company officer.

Course of
Proceedings:            Plaintiffs-Appellees TTHREI, LLC ("TTHREI") and Timothy Holland sued Defendant-Appellant Visionary Industrial Insulation, Inc. ("VII") alleging (1) suit on sworn account in the amount of $90,822.50, along with backup claims for (2) quantum meruit, (3) unjust enrichment, and (4) breach of contract. VII answered and asserted counterclaims for breach of contract and breach of fiduciary duty. Holland, before becoming employed by VII as Chief Operating Officer ("COO"), had served VII as an independent contractor as a consultant, but eventually Holland opted to become an employee and officer of VII. At the conclusion of the employment relationship, Holland claimed he was owed the $90,822.50 sum in dispute for services allegedly performed before his employment with VII. Holland and TTHREI moved for summary judgment on the invoiced amounts and against VII's claims, asserting the invoices as evidence. VII responded with evidence that the statute of limitations ran on 30 of the invoices in dispute, that the invoiced amounts were disputed, that Holland had compensated himself for any alleged differences while acting as COO, and that Holland had accepted settlement money and then breached that contract. VII also filed a cross-motion for summary judgment.

Trial Court:            County Court at Law No. 2, Grayson County, Texas, Trial Court Cause No. 2021-2-130CV

| Trial Court Disposition: | The trial court denied Appellant's summary judgment and granted summary judgment in favor of Appellees. |
|---|---|

**STATEMENT REGARDING ORAL ARGUMENT**

Oral argument would be helpful to the Court's decisional process because this case involves multiple counterclaims regarding overlapping fact issues in dispute. Although the judgment of the trial court includes certain errors that could be reversed through a summary order and memorandum opinion, there are 31 invoices in dispute regarding Appellee Holland's involvement with Appellant VII over the course of several years in multiple roles. Oral argument would assist the Court in sorting through these issues and in making the narrowest ruling necessary to deal with the errors in the summary judgment order. Thus, Appellant submits that oral argument would aid the Court in its decisional process in this case and requests that it be granted.

## ISSUE PRESENTED

Appellee Holland worked for Appellant Visionary Industrial Insultation, Inc. as a consultant and independent contractor under his entity, TTHREI, LLC, until November of 2016 when Holland accepted a position as Chief Operating Officer of Appellant. Holland worked for Appellant as a full-time salaried officer until December 31, 2019, when he resigned and alleged that he was still owed amounts for work done as a consultant. Appellant provided evidence that the statute of limitations had run for claims on all but one of those invoices and that Holland had enriched himself through his employment with Appellant, including by taking leave and adjusting his own compensation based on his view of what he was owed for his alleged consulting work. Appellant offered to resolve the dispute by offering to pay Holland a settlement sum, which was accepted. Nevertheless, Holland and his company sued Appellant in 2022, claiming that purported invoices dated from before his employment in 2016 were still owed.

The issues presented are:

1. Did the trial court err in granting summary judgment in favor of Appellees?

2. Did the trial court err in granting a no-evidence summary judgment in favor of Appellees?

3. Did the trial court err in denying Appellant's cross-motion for summary judgment?

**STATEMENT OF FACTS**

Holland started working for VII as a consultant in January of 2016 under his company, TTHREI. CR 280. This relationship was governed by an "Executive Advisory Services Agreement" (i.e., a consulting agreement) that was drafted by Holland. CR 280-282. The consulting agreement provided, "upon mutual agreement Consultant will consider converting from '1099' to 'employee' status at a later date." CR 281.

In November of 2016, Appellant offered Appellee Holland to begin a full-time salaried position as Chief Operating Officer ("COO"). CR 325. Holland, after expressly accepting Appellant's offer, operated as a full-time, salaried employee in all aspects after this time. CR 325-331. When Appellee Holland was offered the position, he was made aware that he would no longer be a consultant for Appellant. CR 325-26. During these discussions and negotiations between Appellee and Holland, Holland made no mention of continued consultancy through TTHREI or other fees outside of his mutually agreed-upon salary and benefits package to be paid for services as full-time COO. *Id.*

Appellant understood that Appellees had been paid and fees fully remitted for invoices for consulting work prior to Holland's transition to a full-time salaried position. CR 149. Specifically, Appellee, via email,

expressly acknowledges this, confirming "TTHREI consulting fees were incurred *before I became an employee and we had a signed consulting agreement*." CR 329 (emphasis added). When Holland became an employee of VII, VII's relationship with TTHREI ceased. CR 27, 144-45.

It was not until much later when Holland began to demand payment for amounts, he unilaterally claimed were "deferred" that Appellant realized Holland claimed he was owed for purported amounts incurred prior to the start of his employment with Appellant. *Id.*; *see also* CR 329. Once Holland began to demand these amounts, Appellant learned that Holland had submitted additional invoices from his company for purported consulting services while serving as an employee and officer of VII. CR 146-47, 149. Apparently, during his tenure as a full-time, salaried COO, Appellee Holland entered into an agreement with himself and his own company to continue operating as a consultant or self-approved continuation of his previous consultancy. CR 149; *see also* CR 332. As COO, Holland controlled the operations of the company, including its accounting and the distribution of payments. CR 144. Holland had control of the books and distributed payments to himself unilaterally without approval. CR 146-47. For example, in June of 2019, Holland distributed to himself a $6,000 "Vacation Supplement" that was not approved by another officer of VII. CR 14, 106; CR

146-47, 149. Similarly, VII did not approve Holland's unilateral submission of his consulting company's invoices into the accounts receivable. CR 149. Once VII's CEO discovered these accounting and payment practices, the relationship understandably soured, and VII began the process of transitioning Holland out of his role. CR 164 (email from VII CEO to Holland requesting his resignation by November 10, 2019).

On December 31, 2019, Holland resigned from his officer position at VII, and made an offer to VII to settle the allegedly unpaid TTHREI invoices $60,000.00. CR 349-50. On January 31, 2020, VII made a counteroffer to Holland of $20,000.00 to be paid out in increments of $1,500 bi-weekly from January 2020 to May 2020 to satisfy any and all outstanding disputes between the parties. CR 351-52. This counteroffer was verbally accepted by Holland, and the amount was paid to Holland as salary as agreed. CR 353. VII tendered performance in accordance with that agreement and Appellant Holland accepted the payments made. *Id.*

At the center of Appellees' claims are 31 consulting invoices from Appellee TTHREI to Appellant dated February 16, 2016 to July 23, 2017 for consulting services allegedly rendered to Appellant. CR 282-313. Each invoice indicates payment terms of "net 10," meaning that payment for each invoice was due ten-days after the date of the invoice. *Id.*

3

On June 22, 2021, ***more than four years*** after becoming an employee and officer of VII and after transitioning from a part-time consulting role, Holland, and his company TTHREI, sued VII. CR 5-10.

The parties filed competing summary judgment motions. CR 92-180; 191-253. The trial court denied Appellant's motion but granted Appellees' motion resulting in this Appeal. CR Supp. 20-22.

## SUMMARY OF THE ARGUMENT

The trial court's judgment must be fully reversed because, (1) the Appellees failed to carry their burden to establish entitlement to summary judgment, (2) a no-evidence summary judgment was improper and inappropriate, and (3) the trial court should have granted Appellant's cross-motion for summary judgment.

First, the trial court erred in granting Appellees' plaintiff's summary judgment on its affirmative claims for relief and on their no-evidence claims for relief. Appellees moved for summary judgment *only on* their suit on a sworn account claim, but controverting affidavit and attached evidence precluded summary judgment by creating multiple fact issues, including:

- Whether Appellee Holland was acting as an independent contractor pursuant to the independent contractor agreement between him and Appellant while simultaneously acting as the COO for Appellant;

- Whether the independent contractor agreement between

4

Appellee Holland and Appellant concluded in 2017 or continued through 2019;

- Whether the 31 invoices consulting invoices from Appellee TTHREI to Appellant dated February 16, 2016, to July 23, 2017, for consulting services allegedly rendered to Appellant constitute payments due under a continued contract;

- Whether Holland was approved to issue these invoices while he was employed as a full-time COO of Appellant;

- Whether Holland compensated himself by taking time off and making unapproved unilateral distributions to himself as COO;

- Whether Holland created false invoices while he was employed with VII;

- Even if some amount were hypothetically owed to Holland, what the appropriate amount would have been given the multiple issues in dispute regarding Holland's compensation during his employment as an officer of VII; and

- Whether Holland released the claims in a settlement agreement.

CR 95-97; CR 144-49; *see also* CR 269-354.

Second, Appellant's no-evidence summary judgment was insufficient as a matter of law because it failed to challenge a specific element of any one of Appellant's claims. *See* CR 92-180. Moreover, Appellant presented more than a scintilla of evidence in support of its claims. CR 269-354.

Third, the trial court should have granted summary judgment in favor of Appellant in whole or in part. Specifically, Appellees' claims were barred by the statute of limitations, as this suit was filed more than four years after

the disputed invoices were allegedly due to be paid.

Consequently, the judgment below must be reversed.

## ARGUMENTS AND AUTHORITIES

### A.     Standard of Review

Appellate courts "review the granting of a motion for summary judgment de novo." *City of Dall. v. Homan*, No. 05-20-01111-CV, 2022 Tex. App. LEXIS 2148, at *10 (Tex. App.—Dallas Mar. 31, 2022, no pet. h.) (citing *Merriman v. XTO Energy, Inc.*, 407 S.W.3d 244, 248 (Tex. 2013)). "Where, as here, the parties file cross-motions for summary judgment, and the trial court grants one and denies the other," the court "review[s] the summary judgment evidence supporting the motions and determine[s] all questions presented and preserved." *Id.* (citing *Kaufman Cty. v. Combs*, 393 S.W.3d 336, 341 (Tex. App.—Dallas 2012, pet. denied); (*Jones v. Strauss*, 745 S.W.2d 898, 900 (Tex. 1988)).

### B.     The Trial Court Erred in Granting Holland and TTHREI's Traditional Summary Judgment Motion.

Multiple fact issues precluded a summary judgment for Appellees on their suit on a sworn account claim, which was the sole basis of their motion. Because the trial court misapplied the legal standard to the evidence, the summary judgment must be reversed.

When reviewing a summary judgment, this Court must examine the entire record in the light most favorable to the nonmovant, indulging every reasonable inference and resolving any doubts against the motion. *City of Keller v. Wilson*, 168 S.W.3d 802, 824-25 (Tex. 2005). It was Appellees' burden, as the moving party, to establish that no genuine issues of material fact existed, and that Appellees were entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c); *Lear Siegler, Inc. v. Perez*, 819 S.W.2d 470, 471 (Tex. 1991).

"A trial court cannot grant summary judgment on grounds that were not presented." *Nall v. Plunkett*, 404 S.W.3d 552, 555 (Tex. 2013).

Here, the only claim for affirmative relief presented by Appellees' summary judgment motion was Appellees' suit on a sworn account claim. CR 95-97. However, multiple fact issues precluded summary judgment on this claim. See CR 269-354. Therefore, summary judgment was improper.

The elements for a claim for suit on an open account are (1) transactions between parties, (2) creating a creditor-debtor relationship through the general course of dealing, (3) with the account still being open, and (4) with the expectation of further dealings. *Kaldis v. Crest Fin.*, 463 S.W.3d 588, 592 (Tex. App.—Houston [1st Dist.] 2015, no pet.).

Appellant filed a verified denial of Appellees' account, so any automatic presumption created by the mere filing of a suit on a sworn account under Rule 185 was rebutted by Appellant's verified denial. CR 18, 26-29, 182, 238, 246-49, 264-67, 314, 324-27. *See* TEX. R. CIV. P. 93, 185.

In the context of a summary judgment for a suit on a sworn account, several cases illustrate that a defendant's testimony disputing the plaintiff's account can create a fact issue, which prevents a summary judgment. *E.g.*, *Sharif v. Par Tech, Inc.*, 135 S.W.3d 869, 873 (Tex. App.—Houston 1st Dist. 2004); *Livingston Ford Mercury, Inc. v. Haley*, 997 S.W.2d 425, 431 (Tex. App.—Beaumont 1999, no pet.); *Jones v. Houston Materials Co.*, 477 S.W.2d 694, 696 (Tex. App.—Houston [14th Dist.] 1972, no writ); *Am. Home Fence Co. v. Himes*, 374 S.W.2d 777, 779 (Tex. App.—Tyler 1964).

For example, in Sharif, the plaintiff did not file any special exceptions against the denial of the account or the attached affidavit. *Sharif*, 135 S.W.3d at 873. There, the court held that in absence of a challenge to the denial, the sworn denial was sufficient "to destroy the evidentiary effect" of the plaintiff's "verified sworn account pleadings," and it "force[d] the plaintiff to put on proof of its claim." *Id.* Thus, the summary judgment was reversed. *Id.*

And in *Haley*, as here, the defendant presented a controverting affidavit as "summary judgment proof of the incorrectness of the account."

8

*Haley*, 997 S.W.2d at 431. The defendant company's representative provided in the affidavit that the account was "made up of entries not based upon supporting records, but which was instead made up after approximately three (3) years of no billing being sent and no billing entries." *Id.* The court held that the denial and this affidavit was sufficient to defeat summary judgment, as it created a fact issue. *Id.* at 432.

In the matter at bar, the very same material fact issues were created by the unchallenged verified denial and controverting affidavit, as in *Sharif* and *Haley*. Appellant filed its verified denial, and in response to summary judgment provided an affidavit by its CEO disputing the accuracy of the alleged account along with corroborating emails as evidence. E.g., CR 252, 324-27, 330. Just like the company representative in *Haley*, the CEO of VII testified that Holland created unapproved charges in the company accounting records. CR 146-47, 149, 324-27.

Furthermore, Appellant produced evidence that the second and third elements of a an open account were not met because the parties altered the course of dealing when Holland became employed as a full-time, salaried officer of VII. CR 203-04, 329. For example, the summary judgment record shows:

**From:** Tim Holland <█ @eslin.us>
**Sent:** Saturday, August 3, 2019 9:00 PM
**To:** Chang Jang█ @eslin.us>
**Cc:** Jang Jun Kwon█ @eslin.us>
**Subject:** Re: To VII Chief Officers

Are you suggesting we work the factory employees 24 hours per week and pay 24 hours.
If so we have to discuss with TriNet so they can file unemployment for the other hours.

If so we can count on we can probably count on losing all of them.

The other issues I will discuss with you in person. TTHREI consulting fees were incurred before I became an employee and we had a signed consulting agreement.

Thanks

Sent from my iPhone

CR 329. Further, during Holland's April 27, 2022 deposition, Holland provided he was an official officer of Visionary. CR 275-76. Any payments made to TTHREI by VII after the year 2016 were for services rendered in 2016. TTHREI and VII no longer had any sort of contractual work relationship once Holland became an employee of VII. CR 144-47 (Chang, CEO of VII, explaining that VII terminated TTHREI's contract as a vendor and employed Holland as a full-time COO of VII in November of 2016).

Appellee Holland was a fulltime salaried employee as COO of VII beginning on November 13, 2016, and he controlled operations of the company, including its accounting from that time through the termination of his employment. CR 144. Holland had control of the books and distributed payments to himself unilaterally without approval. CR 146-47. For example, in June of 2019, Holland distributed to himself a $6,000 "Vacation Supplement" that was not approved by another officer of VII. CR 14, 106; CR

146-47, 149. As VII's CEO testified regarding his review of Holland's accounting:

> I was in shock and -- and surprised because all the consultation fee has been fully rendered and why there's – there's a dispute fees there. The first time ever because of that, I looked at review thoroughly of the accounting of the company. I know that his fees been all rendered during the consultation period. However after the full-time basis, he was submitting consultation invoices, that's – that's what I found out.· Because after conversion to full-time basis all the other invoice that he submitted, I did not know because he submitted himself -- all by himself. All the -- all the submitted invoices was not approved by me or being shown -- shown to me, this was submitted by himself when he was COO and that's when it was discovered, when that -- when the USDA loan application was submitted. That's how I found it out.

CR 149. Thus, the record makes plain that Appellees' invoices and accounting were contested by disputed evidence and testimony. CR 146 (VII's CEO providing: "we are indicating this as a false record"; "This is something that I did not agree – I did not agree to. This is a false record that was created – created by – record by his [Holland's] CPA and himself").

In defending the fees that he had placed on VII's accounts receivable, Holland claimed that these claimed amounts were not attempts at self-dealing or evidence of double billing, but rather, Holland claimed, these funds were supposedly incurred before the parties had entered any agreement or before he had become an employee (i.e., not a vendor or creditor). *Id.* This statement also demonstrates that Holland claimed that

11

this account was closed because he was now being paid a salary. *Id.* So, Appellees failed to conclusively establish the second and third elements of their claim, and summary judgment was improper.

Moreover, multiple fact issues were presented by Appellant that call into question the amount claimed by Appellees. The summary judgment record included deposition testimony and email statements indicating that VII did not authorize Holland to continue billing consulting services from TTHREI apart from the salary that Holland was to be paid. CR 149, 330, 332. Appellees took for granted that Holland was paid on an hourly basis both during his work for VII as an independent contractor and as an employee. CR 93 at ¶ 2. But the summary judgment evidence demonstrates that VII paid Holland on a salary basis that was not tied with hourly work. CR 325. Plus, the record shows that Holland unilaterally took leave and paid himself at will. CR 332 (showing email from Holland stating that he "reduced" the time he worked to "match the income" he received, and that he was the person who "deferred" his income and instructed Appellant's employees to pay him defined amounts at certain times). Given that Holland was supposed to be paid on a salary, this evidence calls into question the veracity of this account—a portion of which Holland argues was accruing during his salaried employment as an officer of the company.

The trial court further erred in denying Appellant's summary judgment motion as there are remaining issues of material fact, including those set out above, and specifically relating to the alleged breach of fiduciary duty by Appellee Holland. That is, by erring in its ruling as to when Appellee Holland was acting as a 1099 independent contractor and when he became a salaried employee, Appellant's were precluded from arguing its affirmative claim of breach of fiduciary duty relating to the unauthorized misappropriation made at the direction and benefit of Appellee Holland. CR 276-77.

Disputed fact issues remain, including (1) whether Holland could continue to operate as both an independent contractor and a salaried employee serving as an officer of Appellant's organization; (2) whether Appellant authorized Holland to approve additional payments to his consulting firm; (3) whether the amount claimed was correct; (4) whether Holland was double dipping in directing payments for these invoices or double billing in generating these invoices; (5) whether any amount that might have been owed was correct based on these discrepancies; and (6) whether amounts paid to Holland during his employment actually satisfied any outstanding balance. Because more than a scintilla of evidence calls each of these material fact issues into dispute, Appellees failed to carry their summary judgment burden. *See* Tex. R. Civ. P. 166a(b).

The trial court erred in failing to construe the evidence in the light most favorable to Appellant VII as the nonmovant and in resolving disputed fact issues in favor of Appellees. These material fact issues are reserved only for the fact finder after a full trial on the merits. Accordingly, the summary judgment must be reversed.

## C. The No-Evidence Summary Judgment Was Defective as a Matter of Law.

Appellees' no-evidence motion was fundamentally defective, as it failed to specify the elements Appellees contended lacked evidentiary support. *Jose Fuentes Co. v. Alfaro*, 418 S.W.3d 280, 283 (Tex. App.—Dallas 2013, pet. denied) ("A no-evidence motion that only generally challenges the sufficiency of the non-movant's case and fails to state the specific elements that the movant contends lack supporting evidence is fundamentally defective and cannot support summary judgment as a matter of law."). Thus, the summary judgment order could not have been supported by the no-evidence motion as a matter of law.

Appellees asserted a general argument against Appellant's breach of fiduciary duty claim, asserting that the mere fact that Holland was acting as a COO both when he was a consultant and as an employee somehow undermines the fiduciary duty claim. CR 97. But corporate officers and directors owe a fiduciary duty to the corporations they serve. *International*

14

*Bankers Life Ins. v. Holloway*, 368 S.W.2d 567, 576 (Tex. 1963); *see In re Estate of Poe*, 648 S.W.3d 277, 286–87 (Tex. 2022). Additionally, purely personal relationship of trust and confidence can create a fiduciary duty. *In re Estate of Poe*, 648 S.W.3d at 287; *see also Meyer v. Cathey*, 167 S.W.3d 327, 330–31 (Tex.2005); *Schlumberger Tech. v. Swanson*, 959 S.W.2d 171, 176 (Tex.1997). And here, the summary judgment evidence demonstrated that Holland was entrusted with company operations as a COO, and the deposition testimony attached to Appellees' motion provided evidence that Holland engaged in unauthorized self-dealing by unilaterally approving TTHREI invoices. CR 149. Appellant attached evidence to the same effect in its response. CR 330. Indeed, not only did the record demonstrate evidence that Holland submitted unauthorized invoices, but it also showed that Holland controlled when and how he was paid by VII. CR 332.

The record demonstrates, with testimony excerpts, that Appellant disputed Appellees' accounting and claimed that Holland submitted unauthorized payments to himself, engaged in double dipping, and created false accounting records. CR 146-47. Thus, the summary judgment evidence provided more than a scintilla of evidence to support Appellant's breach of fiduciary duty claim.

15

Similarly, Appellees failed to specify any particular element of Appellant's breach of contract claim that supposedly lacked support, and, thus, Appellees' no-evidence motion failed on that claim too. CR 97-98. Appellees again asserted a general argument against the merits of Appellant's breach of contract claim by suggesting that the severance agreement was somehow improper or not binding because it was not in writing. *Id.* But this was not an agreement required to be in writing by the statute of frauds, and the summary judgment evidence provided evidence of the agreement—specifically that VII performed under a verbal agreement by making payments and that Holland accepted those payments. CR 351-53; *see* Tex. Bus. & Com. Code. § 26.01. Not only did Appellees fail to properly challenge any element of Appellant's claim, but also Appellant produced evidence of its breach of contract claim.

Because Appellees failed to properly challenge a specific element of Appellant's claims, the no-evidence motion was deficient as a matter of law. And in any event, Appellant produced more than a scintilla of evidence of its claims. As a result, the trial court erred in granting a no-evidence summary judgment on both Appellant's fiduciary duty and breach of contract claims.

## D. Appellees' Claims are Time Barred.

Appellees' own summary judgment motion established as a matter of law that their breach of contract claims are time barred. CR 191-253. As a result, the trial court erred in failing to grant Appellant's summary judgment claim against Appellees' assertion that Appellant breached an agreement to pay.

The statute of limitations for a breach of contract action is four years from the date of accrual. Tex. Civ. Prac. & Rem. Code § 16.051; *Stine v. Stewart*, 80 S.W.3d 586, 592 (Tex. 2002). An action for breach of contract accrues immediately upon breach. *Barker v. Eckman*, 213 S.W. 3d 306, 311 (Tex. 2006). "A party breaches a contract by failing to perform when that party's performance is due." *E.P. Towne Ctr. v. Chopsticks, Inc.*, 242 S.W. 3d 117, 123 (Tex. App—El Paso 2007, no pet).

Here, Holland himself provided that, "TTHREI consulting fees were incurred before [he] became an employee." CR 329. And Appellees' own motion asserted as an "undisputed fact" that "VII fell behind in its payments starting in October of 2016 and by November of 2016 owed a running balance of $32,532.50." CR 93. And again, each invoice provides that payment was due within 10 days ("net 10"). CR 282-313.

The invoices at issue here indicate that TTHREI allegedly provided consulting services to VII from January 23, 2016, to July 22, 2017. CR 103-37; 205-34. Specifically, here, of the 31 allegedly unpaid invoices, only one of them was still within the statute of limitation for breach of contract when Plaintiffs filed this suit. CR 32, 205-235. Invoice number 2017_0723001 dated July 23, 2017, with a payment due date of August 2, 2017, for the amount of **-$875.00** (negative eight hundred and seventy-five dollars)**,** is the ***only invoice that was within the statute of limitations*** when Plaintiffs filed this suit. CR 235. TTHREI billed $2,125.00 for alleged consulting services rendered to VII, and then subtracted Holland's COO salary of $3,000.00 from the billed amount; this ***resulted in a negative balance (i.e., -$875.00)***, and thus, VII owes no amounts to Plaintiffs for this invoice. CR 235.

Again, it is worth noting that Appellee Holland was a fulltime salaried employee as COO of VII beginning on November 13, 2016, and he controlled operations of the company, including its accounting from that time through the termination of his employment. CR 144. Holland had control of the books and distributed payments to himself unilaterally without approval. CR 146-47. For example, in June of 2019, Holland distributed to himself a $6,000 "Vacation Supplement" that was not approved by another officer of VII. CR

14, 106; CR 146-47, 149. Holland changed from being an independent contractor to a full-time officer, a COO, with fiduciary obligations to VII, and these disputed invoices were all submitted without approval from VII. But even if Holland's allegations were taken as true, the claimed invoices contained due dates more than four years before Holland and his company filed a lawsuit.

The record shows that Appellees did not file a lawsuit until June 22, 2021, CR 2, 5-15. Thus, because Appellees filed their lawsuit more than four years after the payments were due and had not been paid in breach of the terms set by the invoices, Appellees' claims for invoiced amount older than four years are time barred by the statute of limitations.

The trial court erred in denying Appellant's motion for summary judgment on the limitations ground. Thus, the order must be reversed and rendered on those claims.

## PRAYER

For these reasons, Appellant Visionary Industrial Insultation, Inc. respectfully requests that this Court reverse the judgment of the trial court, render judgment on Appellees' claims that are barred by limitations, and remand this case for further proceedings. Appellant requests all further relief in law and in equity to which it may be entitled.

19

Respectfully submitted,
/s/ *J. Spencer Young*
Sul Lee
State Bar No. 24078844
sul@sulleelaw.com
Diren W. Singhe
State Bar No. 24044135
dsinghe@sulleelaw.com
J. Spencer Young
State Bar No. 24101268
syoung@sulleelaw.com
3030 Lyndon B Johnson Fwy, Suite 220
Dallas, TX 75234
Tel) 214-206-4064
Fax) 214-206-4068

- And -

Kyle Carney
State Bar No. 24096789
kyle@carney.law
Carney Law PLLC
9800 Hillwood Parkway, Ste. 140
Fort Worth, Texas 76177
Tel) 817-717-1195
Fax) 214-206-

**ATTORNEYS FOR APPELLANT**

20

## CERTIFICATE OF COMPLIANCE

I certify that this brief contains 4,067 words according to Microsoft Word's Word Count function, excluding the portions of the brief exempted by Rule 9.4(i)(1).

*/s/ J. Spencer Young*
J. Spencer Young

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing instrument has been served to all counsel listed below in accordance with Texas Rules of Appellate Procedure 6.3 and 9.5 on Tuesday, February 20, 2024, via electronic service.

J. Stephen Hunnicutt
Steve@HunnicuttLaw.com
Timothy A. Robinson
Tim@HunnicuttLaw.com
THE HUNNICUTT LAW GROUP
17330 Preston Rd.
STE. 275B
DALLAS, TX 75252
Telephone: (214) 361-6740

*/s/ J. Spencer Young*
J. Spencer Young

**No. 05-23-00539-CV**

IN THE COURT OF APPEALS
FOR THE FIFTH DISTRICT
DALLAS TEXAS

VISIONARY INDUSTRIAL INSULTATION, INC.,

Appellant

v.

TTHREI, LLC AND TIMOTHY HOLLAND,

Appellees

On Appeal from County Court at Law No. 2, Grayson County, Texas,
Trial Court Cause No. 2021-2-130CV

## APPENDIX

| Tab A | Trial Court Judgment |
|-------|---------------------|
| Tab B | Rule 166a |
| Tab C | Record Excerpt – Verified Denial |
| Tab D | Record Excerpt – Affidavit |

| Tab E | Record Excerpt – Email Evidence |
|-------|--------------------------------|
| Tab F | Record Excerpt – Deposition Testimony |

# Appendix
# Tab A

**CAUSE NO. 2021-2-130CV**

| | | |
|---|---|---|
| TTHREI, LLC AND TIMOTHY HOLLAND | § § § | IN THE COUNTY COURT |
| *Plaintiffs/Counter-Defendants,* | § § | |
| v. | § § | COUNTY COURT AT LAW NO 2 |
| | § | |
| VISIONARY INDUSTRIAL INSULATION, INC. | § § | GRAYSON COUNTY, TEXAS |
| *Defendant/Counter-Plaintiff.* | § § § | |

## SUMMARY JUDGMENT

On May 11, 2023, before this Court came to be heard Plaintiffs/Counter-Defendants' Motion for Summary Judgment and Defendant/Counter-Plaintiff's Motion for Summary Judgment. The Court having reviewed the papers on file with the Clerk, hearing arguments of counsel, and begin duly advised in the premises hereby orders:

1.  Plaintiffs/Counter-Defendants' Motion for Summary Judgment is GRANTED.

2.  Defendant/Counter-Plaintiff's Motion for Summary Judgment is DENIED.

3.  The Court FINDS that Plaintiffs Plaintiffs/Counter-Defendants have shown economic damages in the amount of $90,822.50 and incurred reasonable and necessary attorney fees and costs in the amount of $24,628.65.

4.  It is ADJUDGED AND DECREED that TTHREI, LLC AND Timothy Holland shall have a monetary judgment against Visionary Industrial Insulation, Inc. in the amount of $115,451.15. This Judgment amount shall accrue at 5% statutory interest from the date this Judgment is entered until paid in full.

5.      It is ADJUDGED AND DECREED that Defendant/Counter-Plaintiff shall take nothing by way of its counterclaims against Plaintiffs/Counter-Defendants and those counterclaims are DISMISSED WITH PREJUDICE.

6.      In the event of an unsuccessful appeal to the Court of Appeals, Plaintiffs/Counter-Defendants shall be entitled to $5,000.00 in attorney fees.

7.      In the event of an unsuccessful petition for review to the Texas Supreme Court, Plaintiffs/Counter-Defendants shall be entitled to $5,000.00 in attorney fees.

8.      This Judgment disposes of all parties and all causes of action and is appealable.

SO ORDERED

DATE:   **8/30/2023 8:45:14 AM**

_____
JUDGE PRESIDING

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

J. Hunnicutt on behalf of J. Stephen Hunnicutt
Bar No. 10279510
Steve@HunnicuttLaw.com
Envelope ID: 79012624
Filing Code Description: Proposed Order
Filing Description: Proposed Order on Summary Judgment
Status as of 8/29/2023 11:10 AM CST

Associated Case Party: Visionary Industrial Insulation, Inc.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Sul Lee | | filing@sulleelaw.com | 8/29/2023 10:51:27 AM | SENT |
| Sul Lee | | sul@sulleelaw.com | 8/29/2023 10:51:27 AM | SENT |
| Diren WSinghe | | dsinghe@sulleelaw.com | 8/29/2023 10:51:27 AM | SENT |
| Dominique Williams | | DWilliams@sulleelaw.com | 8/29/2023 10:51:27 AM | SENT |
| Yuri Han | | yhan@sulleelaw.com | 8/29/2023 10:51:27 AM | SENT |
| Spencer Young | | syoung@sulleelaw.com | 8/29/2023 10:51:27 AM | SENT |
| Sally Jun | | sjun@sulleelaw.com | 8/29/2023 10:51:27 AM | SENT |
| Catherine Ryan | | cryan@sulleelaw.com | 8/29/2023 10:51:27 AM | ERROR |
| Elizabeth West | | ewest@sulleelaw.com | 8/29/2023 10:51:27 AM | ERROR |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Stephen Hunnicutt | | Steve@hunnicuttlaw.com | 8/29/2023 10:51:27 AM | SENT |
| Timothy Robinson | | tim@hunnicuttlaw.com | 8/29/2023 10:51:27 AM | SENT |
| Ashley Smith | | asmith@sulleelaw.com | 8/29/2023 10:51:27 AM | SENT |
| Ashley Smith | | asmith@sulleelaw.com | 8/29/2023 10:51:27 AM | SENT |
| Ashley Smith | | asmith@sulleelaw.com | 8/29/2023 10:51:27 AM | SENT |
| Kyle Wilson | | kyle@hunnicuttlaw.com | 8/29/2023 10:51:27 AM | SENT |
| Kaedan Watts | | Kaedan@hunnicuttlaw.com | 8/29/2023 10:51:27 AM | SENT |
| Alberta Northcutt-Whitley | | alberta@hunnicuttlaw.com | 8/29/2023 10:51:27 AM | SENT |

# Appendix
# Tab B



The State and Federal rules are current through January 25, 2024. Local District rules are updated periodically throughout the year.

*TX - Texas Local, State & Federal Court Rules  >  TEXAS RULES OF CIVIL PROCEDURE  >  PART II. RULES OF PRACTICE IN DISTRICT AND COUNTY COURTS  >  SECTION 8. Pre-Trial Procedure*

# Rule 166a. Summary Judgment.

**(a) For Claimant.**   A party seeking to recover upon a claim, counterclaim, or cross-claim or to obtain a declaratory judgment may, at any time after the adverse party has appeared or answered, move with or without supporting affidavits for a summary judgment in his favor upon all or any part thereof. A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to amount of damages.

**(b) For Defending Party.**   A party against whom a claim, counterclaim, or cross-claim is asserted or a declaratory judgment is sought may, at any time, move with or without supporting affidavits for a summary judgment in his favor as to all or any part thereof.

**(c) Motion and Proceedings Thereon.**   The motion for summary judgment shall state the specific grounds therefor. Except on leave of court, with notice to opposing counsel, the motion and any supporting affidavits shall be filed and served at least twenty-one days before the time specified for hearing. Except on leave of court, the adverse party, not later than seven days prior to the day of hearing may file and serve opposing affidavits or other written response. No oral testimony shall be received at the hearing. The judgment sought shall be rendered forthwith if (i) the deposition transcripts, interrogatory answers, and other discovery responses referenced or set forth in the motion or response, and (ii) the pleadings, admissions, affidavits, stipulations of the parties, and authenticated or certified public records, if any, on file at the time of the hearing, or filed thereafter and before judgment with permission of the court, show that, except as to the amount of damages, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law on the issues expressly set out in the motion or in an answer or any other response. Issues not expressly presented to the trial court by written motion, answer or other response shall not be considered on appeal as grounds for reversal. A summary judgment may be based on uncontroverted testimonial evidence of an interested witness, or of an expert witness as to subject matter concerning which the trier of fact must be guided solely by the opinion testimony of experts, if the evidence is clear, positive and direct, otherwise credible and free from contradictions and inconsistencies, and could have been readily controverted.

**(d) Appendices, References and Other Use of Discovery Not Otherwise on File.**   Discovery products not on file with the clerk may be used as summary judgment evidence if copies of the material, appendices containing the evidence, or a notice containing specific references to the discovery or specific references to other instruments, are filed and served on all parties together

with a statement of intent to use the specified discovery as summary judgment proofs: (i) at least twenty-one days before the hearing if such proofs are to be used to support the summary judgment; or (ii) at least seven days before the hearing if such proofs are to be used to oppose the summary judgment.

**(e) Case Not Fully Adjudicated on Motion.**   If summary judgment is not rendered upon the whole case or for all the relief asked and a trial is necessary, the judge may at the hearing examine the pleadings and the evidence on file, interrogate counsel, ascertain what material fact issues exist and make an order specifying the facts that are established as a matter of law, and directing such further proceedings in the action as are just.

**(f) Form of Affidavits; Further Testimony.**   Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The court may permit affidavits to be supplemented or opposed by depositions or by further affidavits. Defects in the form of affidavits or attachments will not be grounds for reversal unless specifically pointed out by objection by an opposing party with opportunity, but refusal, to amend.

**(g) When Affidavits are Unavailable.**   Should it appear from the affidavits of a party opposing the motion that he cannot for reasons stated present by affidavit facts essential to justify his opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

**(h) Affidavits Made in Bad Faith.**   Should it appear to the satisfaction of the court at any time that any of the affidavits presented pursuant to this rule are presented in bad faith or solely for the purpose of delay, the court shall forthwith order the party employing them to pay to the other party the amount of the reasonable expenses which the filing of the affidavits caused him to incur, including reasonable attorney's fees, and any offending party or attorney may be adjudged guilty of contempt.

**(i) No-Evidence Motion.**   After adequate time for discovery, a party without presenting summary judgment evidence may move for summary judgment on the ground that there is no evidence of one or more essential elements of a claim or defense on which an adverse party would have the burden of proof at trial. The motion must state the elements as to which there is no evidence. The court must grant the motion unless the respondent produces summary judgment evidence raising a genuine issue of material fact.

Texas Local, State & Federal Court Rules
Copyright © 2024 All rights reserved.

# Appendix
# Tab C

5. Under Tex. R. Civ. P. 92, Defendant generally deny each and every allegation made against them in Plaintiff's Petition and demands strict proof thereof.

## VERIFIED DENIAL

6. Defendant specially denies any liability under Plaintiffs' suit on sworn account claim as Tim Holland was not operating in his capacity as consultant during the vast majority of the billing. Instead, as COO, Tim Holland was an employee of Defendant and had specific and special obligations more thoroughly described below in Defendant's counterclaim. See Affidavit of Chang Hwan Jang attached as Exhibit A.

## AFFIRMATIVE DEFENSES

7. Subject to and without waiving any of the foregoing, under Tex. R. Civ. P. 94, Defendants asserts that Plaintiffs suit is barred in whole or part by the following affirmative defenses:

a. Defendant is not liable as alleged under the affirmative defense of accord and satisfaction. Plaintiffs accepted a payment post-employment with VII as satisfaction for any outstanding amount claimed to be owing by Plaintiffs.

b. Defendant is not liable as alleged because of a failure of consideration. Plaintiffs purportedly continued to consult despite Mr. Holland being a full-time, salaried, officer of Defendant.

c. Defendant is not liable as alleged under the doctrine of laches. Despite an amount being allegedly owed since 2016, Plaintiffs have only now filed a lawsuit seeking to recover such monies alleged to be due. Mr.

# Appendix
# Tab D

CAUSE NO. <u>2021-2-130CV</u>

| | | |
|---|---|---|
| TTHREI, LLC AND TIMOTHY HOLLAND. | § | IN THE COUNTY COURT |
| *Plaintiffs,* | § | |
| | § | |
| | § | |
| v. | § | |
| | § | GRAYSON COUNTY, TEXAS |
| VISIONARY INDUSTRIAL INSULATION, | § | |
| INC. | § | |
| *Defendant.* | § | |
| | § | |

| | | |
|---|---|---|
| | § | |
| | § | |
| VISIONARY INDUSTRIAL INSULATION, INC. | § | IN THE COUNTY COURT |
| *Counter-Plaintiff,* | § | |
| | § | |
| | § | |
| v. | § | |
| | § | GRAYSON COUNTY, TEXAS |
| TIMOTHY HOLLAND | § | |
| | § | |
| *Counter-Defendant.* | § | |
| | § | |

## AFFIDAVIT OF CHANG HWAN JANG

THE STATE OF TEXAS                    §

COUNTY OF ___GRAYSON___        §

BEFORE ME, the undersigned authority, on this day personally appeared, Chang Hwan Jang, who swore or affirmed to tell the truth, and stated as follows:

1. My name is Chang Hwan Jang. I am over the age of 18, of sound mind, capable of making this declaration on behalf of Visionary Industrial Insulation, Inc., and I am personally acquainted with the facts stated therein because of my personal

Page 1 of 4

324

involvement in my role as President of Visionary Industrial Insulation, Inc ("VII"). The facts stated herein are within my personal knowledge and are true and correct.

2. On or around February 2, 2016, I executed an "Executive Advisory Services Agreement - Visionary Industrial Insulation, (VII)" with Tim Holland, a consultant through Tthrei, LLC. In his role as consultant, Tim Holland would serve as Interim COO for Visionary Industrial Insulation, Inc.

3. Mr. Holland remained a consultant with Visionary Industrial Insulation, Inc. ("VII") until November 12, 2016.

4. On November 13, 2016, the consulting relationship ended. Mr. Holland and VII mutually agreed that Mr. Holland would become a full-time, salaried employee of VII. When Mr. Holland agreed to be a full-time employee, his employment status changed from consultant/Interim COO to full-time, salaried COO.

5. As a part of this agreement, Mr. Holland and VII agreed that Mr. Holland would become a full-time employee of VII with a salary of $3,000.00 paid bi-weekly, $78,000/year, plus benefits. Starting September 2, 2018, Mr. Holland's pay was increased to $156,000 per year, with $6,000.00 paid bi-weekly. On July 21, 2019, Mr. Holland year pay was decreased to $80,000.00 per year, with $3,076.92 paid bi-weekly. Starting December 8, 2019, Mr. Holland's pay was decreased to $40,000.00 per year, with $1,534.46 paid bi-weekly.

6. The mutually agreed full-time employee salary was to be Mr. Holland's sole compensation from VII from November 13, 2016, to Mr. Holland's proposed termination date of December 31, 2019.

7. After Mr. Holland transitioned into a full-time employee, Mr. Holland was the COO of VII and not in his capacity as a consultant through Tthrei, LLC. VII does not owe Mr. Holland any consulting fees after he became a full-time employee of VII on November 13, 2016.

8. There was no VII-approved written or verbal agreement to pay Mr. Holland consultant fees in addition to his full-time employee salary. Mr. Holland did not inform or request such non-agreed additional pay.

9. At no time did I or VII approve Mr. Holland to operate as both a full-time, salaried COO and a consultant.

10. After Mr. Holland's voluntary resignation dated December 31, 2019, VII agreed to pay Mr. Holland severance pay in exchange for satisfaction of any outstanding disputes between Mr. Holland and VII.. The amount was to be paid out in increments of $1,538.46 bi-weekly from January 2020 to May 2020 in exchange for a mutually agreeable post-employment agreement. Mr. Holland remained on payroll until May 2020 and received payroll checks according to VII's normal payroll distribution schedule. Mr. Holland, also, continued to receive benefits until May 2020.

11. The last day of employment for Mr. Holland was May 29, 2020. VII issued a final check in the amount of $1,538.46 to Mr. Holland. In addition to his

severance pay, Mr. Holland received a $692.28 phone allowance and $503.76

in Benefits Allowance.

Affiant states nothing further.


**SIGNED** this ___27th___ day of August 2021.

BY: _____

Chang Hwan Jang
President
Visionary Industrial Insulation, Inc.


SWORN TO AND SUBSCRIBED before me [using online notarization] on the 27th day of _August, 2021_, [YEAR].


[SEAL]

_____
Notary Public, State of Texas
Printed name: _Sheri K Otten_
My commission expires: _4/8/24_

SHERI K. OTTEN
NOTARY PUBLIC - STATE OF TEXAS
ID# 13244124-0
COMM. EXP. 04-08-2024

# Appendix
# Tab E



**Chang Jang**

| | |
|---|---|
| **From:** | Chang Jang |
| **Sent:** | Sunday, August 4, 2019 8:48 AM |
| **To:** | Tim Holland |
| **Cc:** | Jang Jun Kwon |
| **Subject:** | RE: To VII Chief Officers |

Any suggestion to make less expense until VII have enough fund for the operation?

Let's discuss for the AP listed TTHREI consulting fees on Tuesday. I have a business trip to CA tomorrow and will be back very late tomorrow. My apology if it was AP incurred prior to become an employee. I couldn't find it from the earlier AP and I thought we cleaned most of it by now….

**Chang H. Jang | _ESLIN™_ Visionary Industrial Insulation**

**President & CEO** |P: 888.984.7776 | M: 214.477.8847 | F:866.439.7415

▇▇▇@eslin.us | http://www.eslin.us



**From:** Tim Holland <▇▇@eslin.us>
**Sent:** Saturday, August 3, 2019 9:00 PM
**To:** Chang Jang ▇▇▇▇@eslin.us>
**Cc:** Jang Jun Kwon ▇▇▇▇@eslin.us>
**Subject:** Re: To VII Chief Officers

Are you suggesting we work the factory employees 24 hours per week and pay 24 hours.
If so we have to discuss with TriNet so they can file unemployment for the other hours.

If so we can count on we can probably count on losing all of them.

The other issues I will discuss with you in person. ==TTHREI consulting fees were incurred before I became an employee and we had a signed consulting agreement.==

Thanks

Sent from my iPhone

On Aug 3, 2019, at 7:12 PM, Chang Jang ▇▇▇▇@eslin.us> wrote:

> Officers,
>
> We are passing through the hot summer and I am feeling lot hotter than last year because of all the business-related worries. Now is a very critical time for VII because of "Not enough fund to support business operation for upcoming months". We have almost completed 3-large projects(▇▇▇▇) over the 8~10 months and total sales this year crossed $3.5MM but VII account shows very low balance…AR looks not enough to maintain our business operation in normal path and AP doesn't seems to be better than last year. I am evaluating sales/accounting history for the past 12 months to understand what caused current problems. I really hate to see our employees to be laid-off but "No company no employee". We have to do whatever to survive during this dark period. Let's operate factory with "3-working days per week" for the hourly employees except critical task related employees. Overtime should be strictly controlled also.

1

VISI0001

# Appendix
# Tab F

Page 13

full-time and he worked for three years.

Q. Were those tasks that were performed the same tasks from the entire time? Or did he change -- did he change what he was doing?

MS. SMITH: Objection; form.

Q. (BY MR. ROBINSON) Did Mr. Holland perform the same tasks from 2015 through whenever he left the company, did he perform the same tasks the entire time?

A. Yeah. So on the consultation agreement, it was 2015 through January 2016 and converted to full-time status and when he left end of 2019, he was working the same work.

Q. I'm going to show -- I'm going to show you what's been marked as Exhibit 1.

(Exhibit Number 1 was marked.)

Q. (BY MR. ROBINSON) All right. Can you see that?

A. Yes, sir.

Q. Okay. And what is this?

A. This is agreement that -- that was under -- end of 2015 that he came and -- and it was an agreement with the TTHREI, I believe, working as COO.

THE INTERPRETER: I'm sorry. Let me correct -- correct that, TTHREI.

Q. (BY MR. ROBINSON) Okay. And under this

Page 14

agreement that you had, was -- was Mr. Holland and his company to act as -- as COO of the company?

A. With this company, it's a -- it's a one-man -- one-man company and it was signed as -- yes, signed as a COO, yes, sir.

Q. And right here where you're looking where it's under -- where it says proposal here, it has a list of examples of tasks to perform. Do you see that?

MS. SMITH: Can you make it bigger, please?

A. Yes, sir.

Q. (BY MR. ROBINSON) Okay. And were these the tasks to be -- that were performed -- I know you said that he was under a contract and then went full time, but are these the tasks that he performed from 2016 until the time he left in 2019?

A. Yes, sir.

Q. Okay. All right. I pulled it down here where it says, terms and conditions. Do you -- do you see that?

A. Yes, sir.

Q. All right. And do you see the part where it -- it states that either party may terminate the agreement with 7 days' notice. Do you see that?

A. Yes, sir.

Q. Okay. And when was this -- when was this

Page 15

provision exercised whereby you gave Mr. Holland notice of termination of this agreement?

A. When it was converted, it was -- a 1099 was given as employee, that's what the notice was -- what went out.

Q. Okay. So your -- so your contention is that when Mr. Holland was -- went from being paid as a 1099 to being paid as an employee that that was the termination of this contract?

A. If you look at it carefully from the 1099 to conversion to full-time employee, there is notices there.

Q. Okay. So was a notice given -- did you -- let me rephrase.

Did you send Mr. Holland an email or any -- or any other written communication that said that this contract was going to be terminated?

A. No. There is -- is not. However, if you look at it --

THE INTERPRETER: Where did he read this?

THE WITNESS: Go up. A little bit. Yeah.

THE INTERPRETER: Okay.

MR. ROBINSON: Mr. Jang, are you done with -- with the answer to that question?

THE INTERPRETER: Do you want me to repeat

Page 16

what Mr. Jang said about the termination in English?

MR. ROBINSON: Yes. Yes, please.

THE INTERPRETER: Okay. I'm trying to find the place. I -- I don't remember everything what he said. I'm asking where that would -- you -- you asked earlier whether there's any documentation where the termination notice was sent, there is none. However it is clearly stated --

A. There's -- there's another condition of when there's -- when there's conversion here.

Q. (BY MR. ROBINSON) Okay.

A. Right there.

Q. Okay. So let's -- let's discuss that. Where it says standard services, that's upon mutual agreement, the consultant will consider converting from 1099 to employee status at a later date. Is this what you're referring to?

A. Yes, sir. That's correct.

Q. Okay.

A. Yeah. Right there.

Q. Okay. So on what date did you exercise this provision or the parties exercise this provision of the contract?

A. In my -- in my recollection, this was around November 2016, when the -- the payment, the check -- the



Page 17

first time check came and went out on that date.

Q. So, is that November of 2016?

A. Yes. In my recollection, it's correct, yes, and also the record shows that it is.

Q. And who drafted this contract?

A. Tim Holland made it.

Q. This is -- this is a -- the TTHREI, this is the -- this is that company's document -- Mr. Holland's document, right?

A. Yes, sir. This is a proposal that -- a consulting agreement that he drafted.

Q. All right. All right. So after -- after that provision in the contract was exercised in November of 2016, did -- did Mr. Holland continue to send invoices to -- to the company for payment?

A. Yes. He did send a -- a couple of invoices that was before the conversion -- conversion which we did not make -- make good on the invoice.

Q. Okay. So the -- my -- my question was, after that conversion. After the conversion to being paid as a -- as a W-2 employee, did Visionary continue to receive invoices from Mr. Holland and TTHREI?

A. No, I did not receive any.

Q. The -- during the pendency of this lawsuit, you have provided -- or Visionary has provided books and

Page 18

records such as balance sheets and the like. Of those balance sheets and financial documents that were provided in discovery, are those true and accurate reflections of the -- of the company's books?

A. Yes. Far as I'm concerned their records are correct, however, I need to tell you that invoice that Tim, TTHREI, some of the invoice are slid in when those are -- some of the invoice are not approved by me or was notified by me of those invoices.

Q. So where did -- where did Mr. Holland submit his invoices to? Was there an accounting department for him to submit those invoices to?

A. When he was consulting he gave me -- the invoice directly to me and I approved those invoice and I signed those invoices.

Q. Does Visionary have a separate accounting department for accounts payable?

A. Yes, sir.

Q. And is that where a -- a vendor would send invoices to to be paid?

A. Yes, sir. Yes.

Q. Okay. All right. I'm going to show you what we have marked and submitted as Exhibit 4.

(Exhibit Number 4 was marked.)

Q. (BY MR. ROBINSON) Okay. All right. Can you

Page 19

see this?

A. Yes, sir.

Q. I'm going to blow it up a little bit bigger. All right. And this is what was submitted by Visionary in response to -- this is the response to discovery request, so this is a Visionary document. What -- what document is this?

A. This is a record that was downloaded from the accounting record from the company.

Q. Okay. So you testified earlier that the -- that the financial records that were provided were true and accurate to the best of your knowledge, so we're -- I'm going to assume that these are accurate numbers that we're talking about here. I pulled this down here to the bottom to the -- to the accounts payable. Highlighted, we have accrued professional fees. Do you see that?

A. Yes, sir, I see it.

Q. Okay. And at the top here where I've got it highlighted December 31st, 2017, just for clarity's sake and how this is on all of these entries, the first column would be the balance of -- of that particular account on December 31st, 2017, and then the second column being the balance of a particular account on December 31st, 2018. Is that your understanding of how

Page 20

to read this balance sheet?

A. Yes, sir, that's correct. They have -- if you have a QuickBooks, this is from QuickBooks. If you downloaded this balance sheet, this is how it comes out.

Q. So going down then and -- and looking at the first column of the -- the accrued professional fees by TTHREI, are we -- I guess it -- it's cut off a little bit because it's not -- it's not continued, but -- but can we assume that -- that this particular account that I have highlighted here is the account for TTHREI, LLC, and Mr. Holland?

A. This is not what I did. This is the account that was done by the CPA by Mr. Holland.

Q. Okay. So -- but do you still maintain that this -- that this is an accurate reflection of the books of -- of Visionary?

A. That's what it says on the record, but right now we are -- we are indicating this as a false record.

Q. So -- so this is -- so as of December 31st, 2017, you're saying these numbers are incorrect?

A. This is something that I did not agree -- I did not agree to. This is a false record that was created -- created by -- recorded by his CPA and himself.

Q. So -- so to clarify, you believe this is a



Page 21

false record, you believe your CPA falsified these records?

A. I don't -- I don't think it's a CPA that did anything wrong, it's that Tim, TTHREI, who submitted this invoice to -- to get -- put these numbers in there.

Q. Okay. So -- so that we're -- so that we're clear, the -- the number is correct, you just don't agree with the invoice being charged?

THE INTERPRETER: I'm sorry. I don't follow you when you say invoice are charged.

MR. ROBINSON: Okay. Let -- then let me -- let me rephrase.

Q. (BY MR. ROBINSON) Let me think of a better way to -- to ask that question.

Your contention is that Visionary does not owe this amount. Your contention is not that there's a mathematical error with the invoice that was provided, but that the invoice itself was for services you did not agree to?

MS. SMITH: Objection; form.

A. I think there's a -- can I -- I need to consult with my attorney. Something's not -- the words is not right here.

MS. SMITH: He -- he doesn't understand the -- the question.

Page 22

MR. ROBINSON: Okay.

Q. (BY MR. ROBINSON) So you don't agree this one -- as of December 31st, 2017, you -- it's your position that you -- that Visionary does not owe $100,000 to TTHREI?

MS. SMITH: Objection; form.

Q. (BY MR. ROBINSON) You -- you don't owe the money? The $100,000 is incorrect; is that correct, on December 31st, 2017?

A. What I'm saying -- what I'm saying is that the 90,000, the next to it, is wrong.

Q. Well, I'm asking that on December 31st, 2017, this $100,000 number that is in the first column, is it Visionary's position that it -- as -- that on December 31st, 2017, it did not owe TTHREI that $100,322.50?

A. Okay. What I'm saying is that the next to it, the 90,000 is wrong.

Q. Okay. All right.

MR. ROBINSON: I'm going to object to nonresponsive.

Q. (BY MR. ROBINSON) I'm not asking about the second column. I'm asking about the first column. That on December 31st of 2017, did Visionary owe TTHREI $100,322.50?

Page 23

A. That number is incorrect, sir.

Q. Okay. If that number is incorrect, how much money did Visionary owe TTHREI on December 31st, 2017?

A. Hold on, please. $9,500.

Q. So on December 31st, 2017, you're saying that you owed -- or Visionary owed TTHREI $9,500?

A. Yes, sir.

Q. And how do you -- upon what do you base that number?

A. For accounting purposes, that -- that is the one invoice that was not count for for doing the consultation.

Q. Okay. And what -- what invoice would that be? Do you have a -- that invoice number or a date of that invoice?

A. I do not know the number of -- number of invoice number, however, it's -- it's been part of the accumulation of our invoices, the balance -- balance of that invoice of accumulation invoices.

Q. And what document are you relying upon to determine what the accumulation of invoices were at that time?

A. It is invoices I have approved, I have signed. Those -- those invoices.

Q. Okay. What invoices -- the invoices that you

Page 24

have signed, what particular invoices are those, meaning what date -- either an invoice number or a date to identify those invoices?

A. It's -- it's been so -- so long ago, a while ago, in my records, I don't know where that -- where that is.

Q. Okay. All right. Well, if -- if you said it was $9,500, how are you able to give me that number?

A. There's a invoice of that -- I do not even know that there - there is -- there is -- they existed and those are the differences -- invoices.

Q. So if those were just the invoices, you know -- you -- you just gave me that number $9,500, where did you see that number to give me that answer?

THE INTERPRETER: Okay. Okay. I lost -- I lost everything what he -- what he said.

A. This -- this fee of 2017, there over $100,000, there's a difference of $9,500.

Q. (BY MR. ROBINSON) A -- a difference of $9,500 from -- from what?

A. Are we not looking at the -- at 2017 and 2018 together?

Q. Yes. We're -- we're looking at those together. Did you get the -- did you -- did you testify $9,500 was what was owed on December 31st, 2017, because that just



Page 25

happens to be the difference between column -- the first column and the second column?

A. Yes, that's correct. I am talking about difference between the first column, second column that's the 9,500. I do not know this very well because I did not really thoroughly look through this; I didn't know this was in there.

Q. Okay. So you're not looking at any particular invoice that you're adding up or payments, you're just merely subtracting the first column from the second column?

A. Yes. If -- if -- yes, that is the difference. However, if I approved the differences, then I'm sure I did.

Q. Okay. So if you approved the differences in these two numbers between December 31st, 2017, and December 31st, 2018, you must have reviewed those numbers at that time; is that correct?

A. Yes. It was -- this was done by COO and CPA. The only thing I -- I never really had this store information. The only thing I believe I had -- I had was the invoices that was approved.

Q. So is it your testimony that this balance sheet, you've never -- you did not review this balance sheet in -- during this fiscal year?

Page 26

A. During the 2017, no, I did -- I did not. It was -- the company was in -- in red, that a lot of negative balances there and that's why when the CPA and COO worked out, and -- and I only -- I only received a report of -- of there's how much negative balance -- balances on that year. This is -- this is from the COO and CPA.

MS. SMITH: Okay, Tim. It's been over an hour. Can we get a 15-minute break here?

MR. ROBINSON: Sure.

(Recess taken 11:15 a.m. to 11:36 a.m.)

Q. (BY MR. ROBINSON) So, Mr. Jang, when we left off before break, we were going over and we were discussing balance sheets, specifically a balance sheet from December 31st, 2017, to December 31st, 2018. I'm going to show you what's been marked as Exhibit Number 5.

(Exhibit Number 5 was marked.)

Q. (BY MR. ROBINSON) All right. Can you see this?

A. Yes, sir, I see it.

Q. All right. I'm going to blow it up just a little bit. All right. Okay. And what is -- what's -- what is this document?

A. As I -- as I said before, it's the same -- from

Page 27

the QuickBooks program, it's a document from accounting -- an accounting document.

Q. Okay. And is this the same balance sheet as before, except for this is from -- balance sheet from December 31st, 2019, to December 31st, 2020?

A. Yes, sir.

Q. Okay. And there was some question that you had about the previous balance sheet in Exhibit Number 4 that we took a look at regarding the accuracy of the numbers that were on the -- on the balance sheet. Have you seen this balance sheet that we're looking at, Exhibit Number 5, have you seen this before?

A. Yes, sir. I -- I saw it when I was reviewing it.

Q. Okay. And are the numbers on this balance sheet on Exhibit Number 5, are they accurate?

A. It is -- it's -- it's in the accounting system, company accounting system, is -- is as good as it gets.

Q. Okay. I'm going to come down here to where we were looking at before with the TTHREI accrued fees. Do you see that where I'm pointing now, the highlighted line item?

A. Yes. Yes, sir, I see it.

Q. Okay. And right now it says as of December 31st, 2019, that the -- is now blank, it is now

Page 28

0 from -- from the balance sheet two years before that, it stated that it was 90,000-some-odd dollars, now it's 0. Why is it now 0?

A. Because 90,000 I found out it was false -- false invoice been submitted and it was made up -- made up, so that's when I found out it's 2019. That is why.

Q. So since you believed you did not owe or Visionary did not owe that money, you just took it off the books; is that right?

A. Yes, because Visionary has no liability with them -- with them. That's why we took it out.

Q. Okay. Did you write this account off with a -- another account in QuickBooks, or did you just delete it out?

A. I don't really exactly remember, but I believe it was deleted out and made a memo or made a note as it was incorrect or false.

Q. When was that deleted out, approximately?

A. I believe sometime late 2019 or -- or 2020.

Q. So on -- so on -- so was it in -- what's the best way to ask this? Was it deleted prior to December 31st, 2019?

A. That's the way it is in the QuickBooks, but I do not know exact date.

Q. When did you find out, in your opinion, that



148

Page 29

you did not owe TTHREI any money?

A. It's going to be a long story. It's going to be a long story. I could dissect it in section by section.

Q. Okay. Then when was the first time -- let's just start with a -- with an approximate date, you don't have to give me the exact date, but an approximate date, of when you first realized that -- that you were -- or Visionary was being invoiced for services that you do not believe were rendered or owed?

A. Approximately late 2019.

Q. Okay. How did you find that out? How did you -- how did you come to understand or know that?

A. At the time this company was processing a USDA loan. All that was processed by Tim and everything was prepared by Tim, and Tim show me the documents that he prepared for USDA. From the loan -- yeah, the loan came out approved, and the distribution of the loan was TTHREI of $90,000 that he approved. I'm sorry. I'm sorry. It was not -- during the -- it was not approved yet, but it was during the process and that -- that list -- itemized list was given to me.

Yes. He had -- he had about $90,000 to allocate to TTHREI that was -- itemized list was given to me. Because I -- I was in shock and -- and surprised

Page 30

because all the consultation fee has been fully rendered and why there's -- there's a dispute fees there. The first time ever because of that, I looked at review thoroughly of the accounting of the company. I know that his fees been all rendered during the consultation period. However after the full-time basis, he was submitting consultation invoices, that's -- that's what I found out. Because after conversion to full-time basis all the other invoice that he submitted, I did not know because he submitted himself -- all by himself. All the -- all the submitted invoices was not approved by me or being shown -- shown to me, this was submitted by himself when he was COO and that's when it was discovered, when that -- when the USDA loan application was submitted. That's how I found it out.

Q. Was the loan ultimately approved?

A. Yes, we did, sir.

Q. When you -- when you discovered the inconsistencies that you testified to regarding these accounts payable to TTHREI, did you notify the lender with respect to those inconsistencies?

A. No -- no, sir. Because this was discovered before all this was submitted to the -- to the USDA loan. And then we -- we -- after discovering this, revised it and sent it -- sent it to the USDA and then

Page 31

the loan was approved.

Q. So is it your testimony here today that when you initially applied for the -- or Visionary initially applied for the USDA loan, that you did not review, approve, or sign any documents on the original application to USDA?

A. No, initially I did not -- I did not sign. However, once we found the information is incorrect and made a correction, then -- then after that, then I signed it and submitted.

Q. So is it your testimony here today that you have -- you never reviewed the balance sheet for Visionary at any time from 2016 until you -- until the loan application process in 2019?

A. I am not expert in accounting, that is why I hired a CPA and COO to look through it. During that time period, we were in red, we were not making money -- money and I was in a situation to have to bring money to put -- to put the funds into the company. That's why I did not thoroughly, specifically, detail-wise look through the accounting and I -- I -- generally I looked at it and that -- that is all.

Q. So the five-page balance sheet that we're looking at here, that same balance sheet for fiscal year 2017, you -- it's your testimony that you never looked

Page 32

at this five-page balance sheet for fiscal year 2017?

A. I cannot say I never looked at it. I did look at it. Because I -- I trusted a -- a CPA who is a FDIC-certified CPA and COO. I trust them to do the work, so I did not question their detail -- detail -- itemized to -- itemized and item to item -- I did -- I did looked at it.

Q. How about fiscal year of 2018, did you look at the balance sheet for fiscal year of 2018?

A. As I just stated earlier, it's the same.

Q. Do you believe that it's common as a CEO of a company not to review the balance sheet with your CPA each year?

A. I do not know accounting very well; however, I needed a -- a specialized skill person who's a CPA who could -- who could do the job and who I could trust. And -- however, at the time the company's in red and there's a -- there are people who invested it -- invested in and they're individually invested in a lot -- a lot of money who -- and a lot of those people who have specialized skills, but during that time, I was very busy as -- as well; that's why I did not thoroughly review -- review the documents.

Q. All right. I'm going to show you what -- let's see here -- what I've got marked as Exhibit Number 3.



## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Envelope ID: 84687204
Filing Code Description: Brief Requesting Oral Argument
Filing Description: Appellant's Brief Requesting Oral Argument
Status as of 2/20/2024 12:16 PM CST

Associated Case Party: VISIONARY INDUSTRIAL INSULATION, INC.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Kyle Carney | 24096789 | kyle@carney.law | 2/20/2024 12:09:24 PM | SENT |
| Sul Lee | | filing@sulleelaw.com | 2/20/2024 12:09:24 PM | SENT |
| Sul Lee | | sul@sulleelaw.com | 2/20/2024 12:09:24 PM | SENT |
| Diren Singhe | | dsinghe@sulleelaw.com | 2/20/2024 12:09:24 PM | SENT |
| Spencer Young | | syoung@sulleelaw.com | 2/20/2024 12:09:24 PM | SENT |
| Sally Jun | | sjun@sulleelaw.com | 2/20/2024 12:09:24 PM | SENT |

Associated Case Party: TIMOTHY HOLLAND

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| J.  StephenHunnicutt | | steve@hunnicuttlaw.com | 2/20/2024 12:09:24 PM | SENT |
| Tim Robinson | | tim@hunnicuttlaw.com | 2/20/2024 12:09:24 PM | SENT |